Todd M. Friedman (216752)
Adrian R. Bacon (280332)
**Law Offices of Todd M. Friedman, P.C.**
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com

Brian D. Flick (Pro Hac Vice Pending)
Marc E. Dann (Pro Hac Vice Pending)
Alisa Adams (277697)
DannLaw
15000 Madison Avenue
Cleveland, Ohio 44107
(216) 373-0539 telephone
(216) 373-0536 facsimile

**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE LABELLE FOUNDATION, INC., ELOISE RESCUE, 4 PAWS KIDDO RESCUE, ANIMALDEFENSERESCUE.ORG, WESTSIDE GERMAN SHEPHERD RESCUE OF LOS ANGELES, INC., AND LISA RITZ**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**IDEXX LABORATORIES, INC.; DOES 1 through 10, inclusive,**<br><br>Defendant. | Case No. 2:24−cv−01131−FLA−SK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**(Amount to exceed $25,000)**<br><br>1. Negligence<br>2. Negligent Misrepresentation<br>3. Fraud<br>4. Violation of the Business and Professions Code Sections 17200 *et seq.* (California Unfair Competition Law);<br>5. Violation of the Business and Professions Code Section 17500 |

Plaintiffs, The Labelle Foundation, Inc., Eloise Rescue, 4 Paws Kiddo Rescue, Animal Defense Rescue, Westside German Shepherd Rescue Of Los Angeles, Inc., and Lisa Ritz, individually and on behalf of all others similarly situated, bring this action against IDEXX Laboratories, Inc. ("Defendant" or "IDEXX") for damages and other relief caused by IDEXX's VetConnect Plus software. Plaintiffs make these allegations on personal information as to those allegations pertaining to itself and its personal circumstances, and upon information and belief, based on the investigation of counsel and facts that are a matter of public knowledge, on all other matters.

## I.    INTRODUCTION

1.    Defendant provides diagnostic and software products and services to veterinary practices worldwide.[1] The company describes itself as a "global leader in pet healthcare innovation"[2] and provides support to more than 50,000 veterinary practices.[3]

2.    Because of the advances in veterinary medicine, diagnostic tests, like those provided by IDEXX, have become more and more prevalent in the evaluation, diagnosis, and treatment of pets. In fact, use of, and reliance on, such tests has become the industry and professional standard for veterinarians in the United States.

3.    On its website, IDEXX touts itself as "a global leader in pet healthcare innovation. Our diagnostic and software products and services create clarity in the complex, constantly evolving world of veterinary medicine. We support longer, fuller lives for pets by delivering insights and solutions that help the veterinary community around the world make confident decisions—to advance medical care, improve efficiency, and build thriving practices."[4]

4.    IDEXX's website claims that its RealPCR testing services, which include testing for distemper and other respiratory illnesses, provide "[d]efinitive answers, faster" and "helps you treat with precision and resolve infections quickly." It also claims that its testing system "virtually eliminates false positives." IDEXX claims its services permit a provider to [r]ule out or definitively identify multiple pathogens or coinfections with a single specimen" and "[a]rrive

---

[1] https://www.idexx.com/en/about-idexx/ (last visited October 26, 2023).
[2] https://www.idexx.com/en/ (last visited October 26, 2023).
[3] https://www.idexx.com/en/about-idexx/ (last visited October 26, 2023).
[4] https://www.idexx.com/en/about-idexx/news/ (last visited March 21, 2024).

at a more accurate diagnosis, initiate targeted therapy, and resolve infections faster."[5]

5.    IDEXX offers cloud-based veterinary software, including VetConnect Plus (VC+), to "simplify the flow of information" and "bring clarity to clinical decision-making."[6] Since 2012, IDEXX has invested more than $450 million in research and development. Part of that investment supports ongoing development and deployment of new features in VC+.[7]

6.    VC+ is a Java-based app that runs on Google App Engine. VC+ allows its users to access test results, compare results to IDEXX Reference Laboratories, collaborate with referral practices in real time, and share client-friendly summaries with their customers.[8] The app is free and accessible from any device, including laptop and desktop computers running practice management systems or via the web, or by using the VetConnect PLUS app on iOS and Android mobile devices.

7.    According to IDEXX, VC+ provides "client-friendly summaries" that permit veterinary providers to "[s]tandardize communications to pet owners with client-friendly summaries to explain normal preventive care screenings." Further, VC+ includes "[a] full diagnostic view [that] can be easily shared with referral practices, specialists, and clients."[9]

8.    According to IDEXX Corporate Vice President and Chief Software Engineering Officer, Jeffrey Dixon, "IDEXX customers who use the app exhibit higher loyalty than customers who don't, which is important in a recurring revenue business model."[10]

9.    While VC+ users pay nothing to access a patient's test results, tests ordered from IDEXX Reference Labs vary in cost depending on an array of factors. For example, IDEXX provides a list of "suggested in-clinic protocol" tests for canines and felines that range in price from $200.00 to $334.00.[11]

10.    Each patient and client that is entered into the VC+ software is given a unique

---

[5] https://www.idexx.com/en/veterinary/reference-laboratories/idexx-realpcr-tests/ (last visited March 21, 2024).

[6] https://www.idexx.com/en/veterinary/software-services/ (last visited October 26, 2023).

[7] https://cloud.google.com/customers/idexx-laboratories (last visited October 26, 2023).

[8] https://cloud.google.com/customers/idexx-laboratories (last visited October 26, 2023).

[9] https://www.idexx.com/en/veterinary/software-services/vetconnect-plus/ (last visited March 21, 2024).

[10] https://cloud.google.com/customers/idexx-laboratories (last visited October 26, 2023).

[11] https://www.idexx.com/media/filer_public/ac/b4/acb4078f-64c7-4d70-b9e4-0b78a2355a10/2023-directory-products-services-nz.pdf (last visited October 31, 2023)

identification number that is located in the patient's profile account. Additionally, VC+ users can edit a patient profile by inserting basic information including but not limited to, patient name, species, gender, and age.[12]

11.    To order a test in VC+, users must select an existing patient or add a new patient. VC+ will not allow a user to select a test unless all required information is entered into the patient's profile. Once that step is complete, users can select a test from a list of frequently ordered tests; search for a test by name, test code, or test component; and/or choose from featured tests, tests for specific diseases, tests organized by body system, or tests organized by categories.

12.    Patient test results can be viewed under a tab labeled, "history" which lists diagnostic results by date. In the event a user is unable to locate a patient's test results, VC+ includes built-in search tools such as "suggested matches" and "search for matches" to find alternative patients who might have been confused with the current patient. For example, "suggested matches" will list any patient that VC+ recognizes as a close match, while "search for matches" allows a user to search for patients with similar names, and/or IDs.[13]

13.    IDEXX knows that the veterinarians and animal clinics to which it provides testing services are not the end-users of its services. And as set forth above, it intends that its test results will be shared with and relied upon by the clients of those veterinarians and clinics.

14.    Despite IDEXX's representations that VC+ brings "clarity to clinical decision-making" VC+ users were devastated and confused when they discovered that, somehow, they had inadvertently misdiagnosed numerous patients, resulting in infectious disease outbreaks and patient death.

15.    It was later discovered that IDEXX included an algorithm in VC+ that automatically merged patient records with similarly named patients. For example, IDEXX's algorithm might locate and merge patients named "Stella Ball" and "Molly Ball" due to the shared last name and placement of double "L's" in the first name.[14] The phenomenon which comprises this error and the automatic merger of patient records is referred to internally by

---

[12] https://www.idexx.com/files/vcplus_release_02.08.2017.pdf (last visited October 31, 2023)
[13] https://www.idexx.com/files/vc-vcplus-user-guide.pdf (last visited October 31, 2023)
[14] Plaintiffs are in possession of internal IDEXX documents which will show that this particular example of a matching issue actually occurred.

IDEXX as a "matching issue."

16.    The merger of patient records by VC+ resulted in VC+ misreporting tests results on individual patients. In the example provided above, the test results for Stella might be reported for Molly. The treating veterinarian would then rely on an incorrect test result in making clinical decisions regarding a particular animal.

17.    The automatic merger of patient records was never disclosed to VC+ users. As such, veterinarian providers were unaware of the potential hidden dangers associated with VC+.

18.    For years, IDEXX has known about the particular matching issues associated with the automatic merger of patient records but considered the problem low priority due to the clientele affected. i.e., animal shelters, rescues, and zoos. In fact, IDEXX software technicians had looked at the issue, but could not determine why it was happening.  Despite knowing that the VC+ software automatically merged patient records, IDEXX has made no efforts to warn providers or fix the issue.

19.    As an illustration of this knowledge and failure to reasonably correct the known matching issues, internal communications dated August 25, 2023 sent by Ahmed Al Kanaani from support to IDEXX state "VDC call about the issue that the customer had today with matching issue Confirm it can't be escalated if the [known] issue and the issue with VC+ [is] known issue it been happening and it known."  Stated otherwise, the matching issue was known to IDEXX and its support team, but nothing was being done about it, and the issue was not even being escalated.  IDEXX's VC+ Support portal reflecting the same call, according to internal documents in possession of Plaintiffs dated August 26, 2023 states "Talked to 3rd person in support.  Said that he would try to escalate it, but most likely it will get bounced back. Said Brian and Eric had worked onit…He said that records do get merged and we don't know why."

20.    IDEXX's algorithm, which automatically merged patient records without warning to VC+ users, caused veterinarians to misdiagnose pets due to inaccurate test results, which led to infectious disease outbreaks and patient death.

21.    End users/patients who purchase medical diagnostic services from IDEXX rely on their veterinarians and professional guidance in deciding to purchase such services from IDEXX, and rely by proxy on the representations made by IDEXX to vets and facilities, who

incorporate those representations into their recommendation to purchase such services. Accordingly, a misrepresentation made to a vet is passed on to an end user via the recommendation of the vet for the end user to purchase a diagnostic or test.  No reasonable vet would recommend IDEXX's services if they knew about the matching issue and algorithm error, and thus no end user would ever purchase said services but for a failure to disclose by IDEXX.

22.    IDEXX owed a duty to the Plaintiffs and Class Members to implement and maintain its software to perform in a reliable manner consistent with reasonable standards and specifications.

23.    IDEXX failed to adequately review its software bugs or service tickets to determine whether software issues impacted the software's ability to perform in a reliable manner consistent with reasonable standards and specifications. As a result, IDEXX's software failed to relay to its customers accurate test results. This failure led to prolonged, patient isolation, unnecessary treatment, additional diagnostic testing, infectious disease outbreaks, and patient death.

24.    Plaintiffs and the Class Members paid for the IDEXX diagnostic tests and services and trusted IDEXX to accurately report diagnostic results for their animals.

25.    IDEXX's software failed to deliver accurate test results, which left Plaintiffs and Class Members deprived of the significant value of the product for which they paid.

26.    Plaintiffs and Class Members bring claims for breach of fiduciary duty, breach of contract, breach of good faith and fair dealing, negligence, fraud, unjust enrichment, violations of California Unfair Competition Law, and violations of California False Advertising Law against Defendant as a result of Defendant's failure to implement and maintain its software, specifically, VC+, to perform in a reliable manner consistent with reasonable standards and specifications.

27.    Plaintiffs and the Class Members by this action seek compensatory damages together with injunctive relief to remediate Defendant's failures.

## II.    JURISDICTION AND VENUE

28.    Defendant routinely transacts business in Los Angeles County, where this action was originally filed.  Defendant has removed this case to federal court from state court, and Plaintiffs do not contest jurisdiction.

29.    Venue in this Court is proper pursuant to Code of Civil Procedure Section 395 and 395.5, Business & Professions Code § 17203, 17204, and Civil Code §1780(c) because Defendants do business and a substantial number of the events or omissions giving rise to the claims at issue in this Complaint arose in Los Angeles. The Plaintiffs reside in Los Angeles County; thus, venue in Los Angeles is proper.

### III.    PARTIES

23.    Plaintiffs are entities or individuals who have purchased diagnostic testing services from veterinarians who used IDEXX Distribution, Inc. for such services and obtained results of those tests using the VC+ software.

24.    IDEXX Distribution, Inc. ("Defendant" or "IDEXX") is a corporation existing under the laws of the state of Massachusetts with its principal place of business located at One IDEXX Drive, Westbrook, Maine 04092.

25.    Defendant regularly conducts business throughout this District, the State of California, and the United States.

### IV.    FACTUAL ALLEGATIONS

26.    IDEXX is a medical devices company, focused on developing, manufacturing and distribution of products and provides services for the companion animal veterinary, poultry and livestock, dairy, and water testing markets. The company offers point-of-care veterinary diagnostic products, microbiological contaminant testing products (in water), livestock, and poultry diagnostic and health-monitoring products, laboratory diagnostic instruments, rapid assay test kits, veterinary reference laboratory diagnostics and consulting services, and practice management and diagnostic imaging systems and services. Additionally, it offers human medical point-of-care and laboratory diagnostics.[15]

27.    The Company distributes products directly and through a network of distributors and resellers throughout the United States, Africa, Asia, Pacific, Canada, Europe, the Middle East, and Latin America.

28.    Defendant's research and development activities in the Companion Animal Group (CAG) segment focus on the development and introduction of new products, services, and technologies to provide veterinarians with diagnostic tools to support advanced medical

---

[15] https://www.globaldata.com/company-profile/idexx-laboratories-inc/ (last visited October 26, 2023).

care and information management solutions.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

### *Plaintiff Labelle Foundation*

29.    Plaintiff The Labelle Foundation, Inc. ("Labelle") is a California nonprofit corporation with its place of business in Los Angeles, CA. Eloise is a 501(c)(3) charitable organization that performs animal rescue, fostering, and placement services in the Los Angeles area.

30.    Many of the animals Labelle works with have been abused or denied routine medical care. Before an animal can be placed for adoption, it must be thoroughly evaluated by a veterinarian for disease and injury. Labelle pays for these evaluations for every animal it deals with.

31.    In pursuing its mission to find homes for dogs, Labelle relies on private donations and placement fees to pay for veterinary care for animals. Placement fees for dogs it places for adoption average between $500 and $750 per dog. However, the average cost of routine, pre-adoption veterinary care is over $1,200 per dog. The difference is paid for through private donations.

32.    When Labelle rescues a dog, it asks a veterinarian to evaluate the animal's health. Such evaluation includes testing for infectious disease. Labelle's preferred veterinary provider, Animal Treatment and Surgical Center ("ATSC"), uses IDEXX for its testing and retrieves test results using the VC+ software. IDEXX's charges for the testing are passed through to Labelle by ATSC and paid for by Labelle.

33.    The accuracy of the diagnostic tests performed on the animals Labelle seeks to place for adoption is critical in determining what treatment, if any, is required for the animal. Labelle relies on the test results in representing to adoption candidates the health of the animal.

34.    Labelle handles about 100 pet adoptions per month. As a result, Labelle spends hundreds of thousands of dollars every year on animal evaluations. A bulk of that amount is spent on diagnostic testing, such as that performed by IDEXX.

35.    In August 2023, ATSC began to question the integrity of the test results it was receiving from IDEXX through VC+. Upon further research, ATSC learned of the problem with the VC+ software–the automatic merging of patient files and the reporting inaccurate results. ATSC reported its concerns to IDEXX and disclosed its concerns to its customers, like

Labelle.

36.     Over the past few years, Labelle has had dozens of situations in which it believes the test results reported through VC+ that did not correlate with clinical observations made by veterinarians. Nonetheless, because of applicable professional standards, final diagnosis and treatment decisions are made in reliance on the test results.

37.     If an animal reportedly tests positive for a disease, such as distemper or parvovirus, Labelle pays for the appropriate treatment, which often includes specialized boarding and veterinary care with a veterinary provider. Such care often costs thousands of dollars. Then, after the course of treatment, the animal must be retested to ensure it is disease-free.

38.     On the other hand, if a test result is reported as being negative, Labelle has relied on that result to place the animal in a new home. At least one adoptive family has complained about receiving a dog from Labelle that was ill. Because that animal was young at the time it was adopted, it was not yet fully vaccinated, so it is impossible to determine if the animal was infected when it was placed or became infected later.

39.     Because of the erroneous test results reported through the VC+ software, Labelle believes that it has needlessly spent tens of thousands of dollars on repeat tests and treatment of animals. It has also lost pets that were not diagnosed or misdiagnosed because of the erroneous results.

40.     Because of the number of errors which have occurred in the reporting of IDEXX test results through VC+, Labelle can no longer trust the test results it pays for and has therefore curtailed its fostering and placement services. It cannot, in good conscience, represent to prospective adopters that an animal is healthy when it knows the tests results from IDEXX are not reliable. As a result, it has had to turn away animals that need a loving home, which, in the past, it would have accepted for fostering and placement.

### *Plaintiff Eloise Rescue*

41.     Plaintiff Eloise Rescue ("Eloise") is a California nonprofit corporation with its place of business in Los Angeles, CA. Eloise is a 501(c)(3) charitable organization that performs animal rescue and placement services in the Los Angeles area.

42.     As part of its mission, when Eloise accepts a rescue animal, it has the animal examined by a veterinarian and asks that thorough testing be performed on the animal,

including blood tests for contagious diseases.

43.    Eloise relies on private donations and placement fees to fund its operations, including paying for veterinary care for animals.

44.    Eloise relies on the results of the veterinarian's examination and test results in advertising the animal for placement with an adoptive family. Eloise does not place animals for adoption if the animal is not disease-free.

45.    If blood tests for an animal indicate the presence of disease, such as distemper or parvovirus, Eloise has the animal treated for the disease before placement in an adoptive home.

46.    When Eloise rescues a dog, it has a veterinary hospital evaluate the animal's health. Such evaluation includes testing for infectious disease. At all relevant times, Eloise's preferred veterinary provider, ATSC, used IDEXX for its testing and retrieved test results using the VC+ software. IDEXX's charges for performing the testing are passed through to Eloise by ATSC and paid for by Eloise.

47.    As with Labelle, ATSC disclosed to Eloise its concerns about the accuracy of test results received through VC+.

48.    Eloise suspects at least three instances when VC+ relayed erroneous test information regarding animals Eloise had rescued and tested.

49.    In one instance, a dog was tested for distemper in the summer of 2023. The test was returned by VC+ as being positive for distemper.

50.    That dog had been vaccinated against distemper prior to the test and did not present any clinical signs of the infection. Vickie Wagner, with Eloise, asked ATSC if it was possible that the positive test was a result of the vaccine. As a result, Ms. Wagner and an ATSC representative called IDEXX customer support to ask the question. The IDEXX representative said that there was no way the vaccine could interfere with the test result and cause a false positive for distemper.

51.    After that call and in accordance with its standard practice, and even though the animal did not present the usual symptoms for distemper, Eloise had its provider treat the animal for the disease. The treatment required isolation of the dog at the provider's facility and professional treatment costing hundreds, if not thousands, of dollars.

52.    After treatment, the provider performed another test for distemper. This second test was returned by IDEXX's VC+ software as negative for distemper.

53.    Eloise then elected to have the dog tested a third time for distemper. This third test was positive for parvovirus even though the animal did not present symptoms for the disease.

54.    Eloise believes that the animal was never actually infected with distemper and that the treatment and additional testing it paid for was completely unnecessary.

55.    A second dog Eloise had evaluated, named Waldo, was initially reported through VC+ as having tested negative for distemper. Eloise

56.    When the animal started to show signs of illness, Eloise had the animal tested again. The second test result reported through VC+ was positive for distemper. That dog died shortly after the test results were reported.

57.    Elosie believes that the animal was infected with distemper at the time of the first  test and VC+ misreported those test results.

58.    A third dog Eloise had evaluated was initially reported through VC+ as having tested negative for giardia, an intestinal disease caused by a parasite.

59.    Relying on the negative test result, Eloise placed the animal with an adoptive family.

60.    The animal subsequently tested positive for giardia, which required the adoptive family to treat the animal for the disease.

61.    Because of the number of errors which have occurred in the reporting of IDEXX test results through VC+, Eloise can no longer trust the test results it pays for and has therefore curtailed its operations. It cannot, in good conscience, represent to prospective adopters that an animal is healthy when it knows the tests results from IDEXX are not reliable.

### Plaintiff 4-Paws Kiddo Rescue

62.    Plaintiff 4 Paws Kiddo Rescue ("4 Paws") is a 501(c)(3) charitable organization with its place of business in Los Angeles, CA. 4 Paws is dedicated to helping dogs in need of socialization and medical care get assistance and care, and then help them to find healthy, permanent homes.

63.    4 Paws relies on private donations and placement fees to fund its operations, including paying for veterinary care for animals.

64.    4 Paws relies on the results of the veterinarian's examination and test results in advertising the animal for placement with an adoptive family. 4 Paws does not place animals

for adoption if the animal is not disease-free.

65.    If blood tests for an animal indicate the presence of disease, such as distemper or parvovirus, 4 Paws has the animal treated for the disease before placement in an adoptive home.

66.    4 Paws's preferred veterinary provider, ATSC, used IDEXX for its testing and retrieved test results using the VC+ software. IDEXX's charges for performing the testing are passed through to 4 Paws ATSC and paid for by 4 Paws.

67.    As with its other customers, ATSC disclosed to Eloise its concerns about the accuracy of test results received through VC+.

68.    4 Paws suspects at least one instance when VC+ relayed erroneous test information regarding animals 4 Paws had rescued and tested.

69.    4 Paws rescued three terriers from an animal shelter that were scheduled to be euthanized. The animals came from a single home described as "a hoarder situation." 4 Paws took the three dogs to its veterinarian for testing in late July 2023. The animals had been together at the hoarder's house, and kenneled together at the animal shelter and at 4 Paws's facility and remained boarded together at the veterinarian's facility. All three dogs were tested at the same time. VC+ reported the tests of two of the dogs as negative for distemper. One of the dogs, named Harlan, however, tested positive for distemper. This was extremely odd because distemper is highly contagious and animals in close proximity to an infected animal can become infected easily.

70.    Per standard care protocols, the dog that tested positive was isolated and treated for distemper. The dog was treated for three weeks and was again tested for distemper. The second test was reported by VC+ as being negative.

71.    At no time prior to or after VC+ reported the positive test result did the dog ever display any symptoms of distemper. Neither did his two companion dogs.

72.    The veterinarian care provided to the dog cost 4 Paws between approximately $2,500 and $3,000.

73.    4 Paws eventually placed the dog in a permanent home, however, because of the conflicting test results and the known error in VC+, it cannot be certain whether the dog is actually disease-free.

74.    Because of the number of errors which have occurred in the reporting of IDEXX

test results through VC+, 4 Paws can no longer trust the test results it pays for and has therefore curtailed its operations. It cannot, in good conscience, represent to prospective adopters that an animal is healthy when it knows the tests results from IDEXX are not reliable.

### *Plaintiff Animaldefenseresecue.org*

74.    Animaldefenserescue.org ("ADR.org") is a 501(c)(3) charitable organization with its place of business in Eastsound, WA. ADR.org is dedicated to saving dogs from high kill shelters in California, assuring a thorough exam and procedures at a veterinary clinic in California before placing them in permanent homes, primarily in the greater Seattle area.

75.    ADR.org is a small rescue shelter small 501(c)(3) rescue organization that is operated entirely and single-handedly by a single volunteer, its founder, Annette Bowman. ADR.org is funded, in part, by placement fees for adopted dogs and some smaller private donations. However, most of ADR.org's operations are funded by Ms. Bowman out of her own pocket since 2011 when she founded ADR.org.

76.    All dogs that ADR.org adopts out are spayed or neutered and microchipped. ADR.org ensures that each dog has all bloodwork done, including testing for disease, and ensures all its dogs are fully vaccinated.

77.    ATSC provided ADR.org with veterinary services for some of its animals and used IDEXX for its testing and retrieved test results using the VC+ software. IDEXX's charges for performing the testing are passed through to ADR.org by ATSC and paid for by ADR.org.

78.    ADR.org suspects at least two instances when dogs rescued by ADR.org were affected by erroneous test information relayed through VC+.

79.    ADR.org rescued two dogs in the greater Los Angeles area. At the time, the dogs were, in fact, ill with upper respiratory pneumonia. ADR.org had its veterinarian treat the dogs for their illnesses. The dogs responded well to treatment and their conditions improved, however, the animals then relapsed without apparent reason.

80.    ADR.org believes the dogs were reinfected by other animals whose IDEXX test results were erroneously reported to the provider.

81.    As a result, ADR.org paid thousands of dollars in treatment and quarantine boarding for the animals. It also paid for numerous rounds of testing for the animals, only to realize recently that test results reported to its provider through VC+ were untrustworthy.

*82.*    Because of the number of errors which have occurred in the reporting of IDEXX

test results through VC+, ADR.org can no longer trust the test results it pays for and has therefore curtailed its operations. It cannot, in good conscience, represent to prospective adopters that an animal is healthy when it knows the tests results from IDEXX are not reliable. This, in turn, has resulted in decreased revenue from placements of animals in permanent homes.

### Plaintiff Westside German Shepherd Rescue Of Los Angeles, Inc.

83.    Westside German Shepherd Rescue Of Los Angeles, Inc. ("Westside") is a 501(c)(3) charitable organization with its place of business in Los Angeles, CA. Westside is committed to saving all types of German Shepherd dogs from high kill shelters and adopting them to loving, qualified homes.

84.    Westside relies on private donations and placement fees to fund its operations, including paying for veterinary care for the dogs.

85.    Prior to adopting a dog, Westside ensures the dog is spayed/neutered, microchipped (with registration), and has up to date vaccinations.

86.    While Westside charges a placement fee of $375.00 per animal, the normal cost of pre-adoption veterinary testing and care for a dog is at least $1,500.00. The difference is paid from private donations.

87.    If blood tests for a dog indicates the presence of disease, such as distemper or parvovirus, Westside has the animal treated for the disease before placement in an adoptive home. In these cases, the cost of care increases significantly.

88.    Westside's often refers its rescued dogs to ATSC, which uses IDEXX for its testing and retrieves test results using the VC+ software. IDEXX's charges for performing the testing are passed through to Westside by ATSC and paid for by Westside.

89.    Westside suspects at least one instance when VC+ relayed erroneous test information regarding animals Westside had rescued and tested.

90.    Westside had at least one dog test positive for distemper even though the dog had been vaccinated against the disease within the prior three months. Despite the up-to-date vaccination record, Westside asked ATSC to run a full respiratory PCR panel for the dog. The test results were delivered to ATSC through VC+ and reported that the animal was positive for distemper.

91.    The test result was unusual for two reasons. First, the dog had been vaccinated

against distemper. Second, the animal did not show the clinical indications of the disease. Nonetheless, because of the positive test result, the dog was isolated and treated for distemper. During treatment, Westside had to withdraw the animal from adoption availability. Subsequent testing indicated that the dog merely had kennel cough.

92.    Westside incurred substantial expense to have the animal quarantined and treated for a disease it did not have.

### *Plaintiff Lisa Ritz*

93.    Lisa Ritz ("Ritz") is an animal lover who has volunteered as an animal rescuer in Los Angeles, CA for several years. In the course of her rescue work, Ritz obtained medical care for rescued dogs and cats, which care has included testing for disease.

94.    Ritz's often had ATSC provide care for her animals, and ATSC used IDEXX for its testing and retrieved test results using the VC+ software. IDEXX's charges for performing the testing are passed through to Ritz by ATSC and paid for by Ritz.

95.    Ritz suspects at least two instances when VC+ relayed erroneous test information regarding cats Ritz had rescued and tested for infectious disease. VC+ reported the tests of both cats as being negative for distemper, but the animals soon developed symptoms of the diseases and died.

96.    Because of the number of errors which have occurred in the reporting of IDEXX test results through VC+, Ritz can no longer trust the test results it pays for and has therefore curtailed her efforts. She cannot, in good conscience, represent to prospective adopters that an animal is healthy when it knows the tests results from IDEXX are not reliable.

97.    Moreover, Ritz now fears that she might have unknowingly placed sick animals into homes after representing to the adopting family that the animal tested negative for disease. Such an error could introduce disease to other animals in that home. In either event, Ritz fears that should could be held liable for the error.

### VI.    CLASS ALLEGATIONS

98.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), b(1), b(2) and c(4) on behalf of themselves and a Class defined as follows:

*Class*: All persons[16] in the United States 1) who paid veterinary providers for IDEXX laboratory tests between Four years prior to the filing of the Complaint, through the date of class certification, and 2) those providers used VetConnect Plus to obtain the results related to those tests.

*California Subclass*: All persons in the Class who obtained such tests in the State of California.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of the Court and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

99.     Plaintiffs reserve the right to amend the Class definitions and to add sub-classes as appropriate if discovery and further investigation reveal that the Class should be expanded, otherwise divided into sub-classes, or modified in any way.

100.    **Numerosity**: Joinder of all members of the Class is impractical because approximately 50,000 veterinarian providers use IDEXX's products and services, and those veterinarian providers services hundreds of thousands of customers, including thousands of animal rescue organizations, shelters, and zoos. Plaintiffs reasonably estimate that there are tens of thousands of patient records throughout the United States that have been improperly merged due to IDEXX's faulty algorithm.

---

[16] "Persons" shall include both businesses and consumers, and to the extent any legal or factual basis for disparate treatment arises throughout this litigation, Plaintiffs reserve the right to further differentiate these groups as separate subclasses.

101.    **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a.  Whether Defendant intentionally or by way of gross negligence created an algorithm that produced unreliable and inaccurate records for all Class Members who obtained test results through VetConnect Plus;

    b.  Whether Defendant misrepresented the quality of its VetConnect Plus product;

    c.  Whether Defendant represented that its VetConnect Plus program had characteristics and benefits it did not have;

    d.  Whether Class Members have been injured by Defendant's conduct;

    e.  Whether Plaintiffs and the Class are entitled to relief, and the amount and nature of such relief;

    f.  Whether Plaintiffs and the Class are entitled to injunctive relief;

    g.  Whether Defendant has engaged in unfair business practices in violation of California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code, § 17200; and

    h.  Whether Defendant made untrue or misleading statements in the advertisement of its products and/or services in violation of California False Advertising Law (FAL), Cal. Bus. & Prof. Code, § 17500.

102.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and Class Members sustained damages arising out of the same acts and omissions of Defendant and their legal claims arise from the same IDEXX practices, as alleged herein.

103.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs' claims are made in a representative capacity on behalf of the other members of the Class. Plaintiffs have no interests antagonistic to the interests of the other members of the Class and are subject to no unique defenses. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiff and the Class.  Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so.

104. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class members. The common issues arising from the Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

105. **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small in comparison to the burden and expense of individual prosecutions of litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties and the court systems of many states and federal districts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

106. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge to those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

## VII.    CAUSES OF ACTION

### COUNT I

### Negligence

### (On Behalf of Plaintiffs and the Class)

107. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs as if fully set forth herein.

108.    IDEXX owed Plaintiffs and Class Members a duty to produce, transfer, and/or store patient test results in a manner that maintained the integrity of those records and the accuracy of the test results.

109.    Plaintiffs and Class Members had a reasonable expectation that reasonable care would be exercised in the production, transfer, and/or storage of patient test results in VC+.

110.    Defendant had full knowledge of the types of harm that Plaintiffs and Class members could and would suffer if the integrity of patient test results was compromised.

111.    Defendant knew or reasonably should have known that the failure to exercise due care in producing, transferring, and/or storing patient test results in VC+ involved an unreasonable risk of harm to Plaintiffs and Class members.

112.    Plaintiffs and Class Members were the foreseeable and probable victims due to the fact that it was their patient's records that IDEXX produced, transferred, and stored via VC+. Defendant knew or should have known of the inherent risks in automatically merging patient records based solely on similar names without notice to Plaintiffs and Class Members.

113.    Given that IDEXX produces, transfers, and stores patient records on behalf of Plaintiffs and Class Members, a foreseeable risk of harm to Plaintiffs and Class Members existed and exists.

114.    Plaintiffs and Class Members had no ability to prevent and/or detect the merging of patient records and had no indication that Defendant was failing to implement and maintain reasonable methods to protect the integrity of patient records.

115.    Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members but failed to do so.

116.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement and maintain reasonable methods to protect the integrity of patient records and accuracy of test results.

117.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs, and Class Members the existence and scope of the errors associated with its algorithm.

118.    There is a close causal connection between Defendant's failure to produce, transfer, and store patient records of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members.

119.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, no member of the Class can guarantee the accuracy of patient test results.

120.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries in the future, including economic and non-economic damages.

121.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class members are entitled to recover actual and punitive damages.

<u>**COUNT II**</u>

**Negligent Misrepresentation**

**(On Behalf of Plaintiffs and the Class)**

122.    Plaintiffs incorporate all of the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    Defendant misrepresented to Plaintiffs and Class Members that it was providing accurate patient test results through its software application, VC+, when it was in fact improperly misplacing patient test results in the wrong files, thereby providing inaccurate patient test results.

124.    Defendant's representations were false and Defendant failed to exercise reasonable care in communicating patient test results to Plaintiffs and Class Members.

125.    Defendant was fully aware of the insufficiencies embedded in an algorithm it created and was further aware that the insufficiencies had the potential to provide inaccurate patient test results to Plaintiffs and Class Members.

126.    Plaintiffs and Class Members justifiably relied on Defendant's false information and were induced to obtain Defendant's products and services in reliance thereon.

127.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class members have been substantially harmed because they purchased laboratory tests from IDEXX and received inaccurate results that led to infectious disease outbreaks and patient death.

128.    As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

///

///

## **COUNT III**

### **Fraud**

### **(On Behalf of Plaintiffs and the Class)**

129.    Plaintiffs incorporate all of the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    Defendant misrepresented to Plaintiffs and Class Members that it was providing accurate patient test results through its software application, VC+, when it was in fact improperly misplacing patient test results in the wrong files, thereby providing inaccurate patient test results.

131.    Defendant was fully aware of the insufficiencies embedded in an algorithm it created and was further aware that the insufficiencies had the potential to provide inaccurate patient test results to Plaintiff and Class Members.

132.    Defendant's misrepresentation and omissions were material. Plaintiffs and Class Members would not have purchased and used Defendant's products and services had they known that Defendant would provide inaccurate test results that would jeopardize their reputation in the community and place the animal population at risk for infectious disease and death.

133.    Defendant intended to induce Plaintiffs and Class Members to rely on its misrepresentations and had reason to expect that Plaintiff and Class Members would rely on the misrepresentations that it made to them because of the continuous relationship between Defendant and the Class.

134.    Plaintiffs and Class Members reasonably relied upon the representations Defendant made while placing laboratory test orders on behalf of its patients and clients.

135.    Plaintiff and Class Members were justified in relying upon Defendant's representations that it would provide accurate test results because Defendant advertised itself as a "global leader in pet healthcare innovation" who provided support to more than 50,000 veterinary practices.

136.    Plaintiff and Class Members have been substantially harmed because they purchased laboratory tests from IDEXX and received inaccurate results that led to infectious disease outbreaks and patient death.

137.    As a direct and proximate result of Defendant's fraudulent misrepresentation, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

## COUNT IV

**Unlawful Business Practices in Violation of Cal. Bus. & Prof. Code § 17200, *et seq*.**

**(On Behalf of Plaintiff and the California Sub-Class)**

138.    Plaintiffs incorporate all of the allegations contained in the preceding paragraphs as if fully set forth herein.

139.    The Cal. Bus. & Prof. Code §§ 17200, et seq., provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code.

140.    Plaintiffs and Class Members have suffered injury in fact and have lost money as a result of Defendant's actions as set forth herein. Specifically, prior to the filing of this action, Plaintiffs and Class Members purchased laboratory tests from IDEXX who unfairly, unlawfully, deceptively, and misleadingly represented its capability to provide accurate, reliable, and definitive test results. Despite its representations, IDEXX delivered unreliable and inaccurate test results with catastrophic consequences. Therefore, Defendant's representations are likely to mislead and deceive consumers who read and rely upon the material representations that its products and services "create clarity" and provide resources for "effective clinical decision-making." Reasonable consumers such as the Plaintiffs and Class Members interpret terms like "effective," "accurate," "reliable," and "definitive" to mean that the information is correct, exact, and free from error. However, IDEXX delivered products and services that were riddled with error.

141.    In its marketing and advertising, Defendant makes false and misleading statements regarding the uses and benefits of its products and services.

142.    The misrepresentations by Defendant are material facts and constitute an unlawful business practice in violation of sections Cal. Bus. & Prof. Code §§ 17200, *et seq*.

143.    Plaintiffs and Class Members were misled and the misrepresentations and omissions were uniform and material.

144.    Pursuant to Business and Professions Code § 17203, Plaintiffs and Class members seek an order of this Court enjoining Defendant from continuing to engage, use, or

employ its practice of advertising the sale and use of VC+. Additionally, Plaintiffs and Class Members request an order awarding restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations.

145.    Plaintiffs and Class Members have suffered injury in fact and have lost money as a result of Defendant's false representations.

146.    Actions for relief under the unfair competition law may be based on any business act or practice that is within the broad definition of the UCL.  Such violations of the UCL occur as a result of unlawful, unfair or fraudulent business acts and practices.  A plaintiff is required to provide evidence of a causal connection between a defendant's business practices and the alleged harm--that is, evidence that the defendant's conduct caused or was likely to cause substantial injury. It is insufficient for a plaintiff to show merely that the defendant's conduct created a risk of harm.  Furthermore, the "act or practice" aspect of the statutory definition of unfair competition covers any single act of misconduct, as well as ongoing misconduct.

UNFAIR

147.    California Business & Professions Code § 17200 prohibits any "unfair ... business act or practice."  Defendant's acts, omissions, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to Purchasers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Plaintiff reserves the right to allege further conduct which constitutes other unfair business acts or practices.  Such conduct is ongoing and continues to this date.

148.    UCL cases have applied a variety of tests for what constitutes an "unfair" business practice. *See Durrell v. Sharp HealthCare*, 183 Cal. App.. 4th 1350, 1365 (2010). Here, the facts are most analogous to two of the three tests as applicable standards.

149.    The FTC test requires a Purchaser must show that the injury: (1) is substantial; (2) is not outweighed by any countervailing benefits to Purchasers or competition; and, (3) is not one that Purchasers themselves could reasonably have avoided.

150.    Here, Defendant's conduct has caused and continues to cause substantial injury to Plaintiffs and members of the Class.  Plaintiffs and members of the Class have suffered injury in fact due to Defendant's faulty algorithm programmed into VC+ which results in matching issues and instances of mixed accounts for patients who purchase and/or receive medical diagnostic testing from Defendant.

151.    By not only programming its system in a faulty manner, but thereafter by knowingly failing to correct it after becoming aware of the matching issues, and omitting the truth of its faulty nature to medical facilities, patients, end users and other consumers of its services, Defendant led Plaintiffs and members of the class to believe that they were purchasing reliable medical diagnostic services when in fact, the results for said services were not only unreliable, but in many cases, led to misdiagnoses.  These failures caused a plethora of injuries and damages including not only the purchase price itself, but also false positives which led to foreseeable unnecessary precautionary medical expenses, and false negatives which led to foreseeable harm to the patients and a further spread of illness to other animals. Thus, Defendant's conduct has caused substantial injury to Plaintiffs and the members of the Class.

152.    Plaintiffs and members of the class purchased services that were either of zero value or in many cases, which were of negative value and caused substantial injury, despite having paid for services which were recommended to patients for medical reasons and were anticipated to be of substantial medical and informational value justifying their price point of hundreds of dollars each. Thus, Defendant's conduct has caused substantial injury to Plaintiffs and the members of the Class.

153.    Moreover, Defendant's conduct as alleged herein solely benefits Defendant while providing no benefit of any kind to any Purchasers.  Defendant elected to program its VC+ software in a faulty manner, failed to properly test it, and then after discovering the faulty algorithm, continued to sell the services rather than fix the error, all to save money.

154.    Plaintiffs forewent purchasing other medical diagnostic services, or seeking other treatment, or none at all, as a result of Defendant's representations and failures. In addition, Plaintiffs and the class members suffered injury not only from lost monies due to being provided unreliable services, but incurred substantial out of pocket expense as a result of the foreseeable misdiagnoses which resulted from Defendant's misconduct.

155.    The second alleged test under for determining unfairness under the UCL is a balancing test as to whether the business practices is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 887 (1999).

156.    Here all of these factors weigh heavily in favor of Defendant's business practices being unfair. The Defendant took advantage of its position as a market leader in providing medical diagnostic testing for animal patients, as well as the severe informational gap between itself, the facilities which contract to purchase its services, and the consumers and patients who are end users of the products.  End users and facilities which coordinate the purchase of Defendant's services all justifiably believe that Defendant is providing reliable medical diagnostic testing, the results for which will in fact be matched with the correct patients.  Any reasonable facility or end user consumer of Defendant's products would believe as much.  No reasonable consumer of medical diagnostic services would ever think that the services they were purchasing might mix up their test results with another patient as a result of faulty software, much less that this would happen on a systematic basis even after it became a known problem and that a medical diagnostic company would hide it from their consumers and fail to promptly fix the issue.  Yet that is what Defendant did.  Defendant has acted, immorally, unethically, oppressively, unscrupulously, and has caused a substantial injury to consumers as detailed above.

157.    Finally, the injury suffered by Plaintiffs and members of the Class is not an injury that these Purchasers could reasonably have avoided.

158.    Thus, Defendant's conduct has violated the "unfair" prong of California Business & Professions Code § 17200.

FRAUDULENT

159.    California Business & Professions Code § 17200 prohibits any "fraudulent ... business act or practice."  In order to prevail under the "fraudulent" prong of the UCL, a Purchaser must allege that the fraudulent business practice was likely to deceive members of the public.

160.    The test for "fraud" as contemplated by California Business and Professions Code § 17200 is whether the public is likely to be deceived.  Unlike common law fraud, a §

17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

161.    Here, not only were Plaintiffs and the Class members likely to be deceived, but these Purchasers were actually deceived by Defendant.  Such deception is evidenced by the fact that Plaintiffs agreed to purchase medical diagnostic services from Defendant under the basic assumption that they were reliable and would not suffer from a matching issue that mixed the results of their tests with other patient test results, leading to worthless and even harmful false positive and false negative results.

162.    Plaintiffs and the Class reasonably relied on the reliability of medical diagnostic services by Defendant in deciding to purchase such services.

163.    The reliability was falsely represented to be reliable when in fact, there was a known faulty algorithm that resulted in unreliable test results which were reported for the wrong patient and provided mixed account results to end users.

164.    Such falsity is material – people who purchase medical diagnostic services reasonably expect and desire for the test results to pertain to the actual patient for which they are seeking such diagnostics so they may make proper medical decisions for the animal. Failing to provide this causes a cavalcade of foreseeable injuries as discussed herein.

165.    Due to both misrepresentations and omissions of material known facts, Defendant committed fraud upon its customers and the general public.

166.    Due to the unequal bargaining powers of Defendant and Class Members, it is likely that Defendant's fraudulent business practice would deceive other members of the public.

167.    As explained above, Defendant deceived Plaintiff and other Class Members by representing its medical diagnostic services to be reliable, and failing to disclose a known defect which caused them to be unreliable and in fact harmful to end users who relied upon such unreliable results to make medical decisions for their pets or animals under their care.

168.    Thus, Defendant's conduct has violated the "fraudulent" prong of California Business & Professions Code § 17200

UNLAWFUL

169.    California Business and Professions Code Section 17200, et seq. prohibits "any unlawful…business act or practice."

170.    As explained above, Defendant deceived and misled Plaintiffs and other Class Members by falsely representing the reliability and value of its medical diagnostic testing services.

171.    Defendant used false advertising, marketing, and misrepresentations to induce Plaintiffs and Class Members to purchase its medical diagnostic services, in violation of California Business and Professions Code Section 17500, et seq.  This was through both affirmative misrepresentations and fraudulent omissions.  Had Defendant not falsely advertised, marketed or misrepresented the medical diagnostic services, Plaintiff and Class Members would not have purchased them. Defendant's conduct therefore caused and continues to cause economic harm to Plaintiff and Class Members.

172.    These representations by Defendant are therefore an "unlawful" business practice or act under Business and Professions Code Section 17200 *et seq.*

173.    Defendant has thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff and Class Members to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief.  Additionally, pursuant to Business and Professions Code section 17203, Plaintiff and Class Members seek an order requiring Defendant to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Defendant to correct its actions.

174.    Plaintiffs and the Class accordingly are entitled to relief as provided for under the UCL, including restitution, declaratory relief, and a permanent injunction. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

## COUNT V

**False and Misleading Advertising in Violation of Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

**(On Behalf of Plaintiffs and the California Sub-Class)**

175.    Plaintiffs incorporate all of the allegations contained in the preceding paragraphs as if fully set forth herein.

176.    This cause of action is brought pursuant to Business & Professions Code §§ 17500 *et seq.*

177.    Business & Professions Code § 17500 provides that it is unlawful for any person or corporation, or any employee thereof "with intent directly or indirectly to dispose of real or

personal property … or to induce the public to enter into any obligation relating thereto, to make or disseminate of cause to be made or disseminated before the public in this state, or to make of disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property … or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading …"

178.    In its advertising, Defendants makes false misleading statements that its products and services are accurate, reliable, effective, and definitive.

179.    Plaintiffs and Class Members purchased and used Defendant's products and services that Defendant unfairly, unlawfully, deceptively, and misleadingly represented to be accurate, reliable, effective, and definitive. Despite its representations, IDEXX delivered unreliable and inaccurate test results with catastrophic consequences. Therefore, Defendant's representations are likely to mislead and deceive consumers who read and rely upon the material representations that its products and services "create clarity" and provide resources for "effective clinical decision-making." Reasonable consumers such as the Plaintiffs and Class Members interpret terms like "effective," "accurate," "reliable," and "definitive" to mean that the information is correct, exact, and free from error. However, IDEXX delivered products and services that were riddled with error.

180.    Defendant engaged in the deceptive conduct alleged above, which included deceptive and untrue representations regarding its products and services, made to induce the public to purchase its products and services.

181.    In its marketing and advertising, Defendant makes knowingly false and misleading statements regarding the characteristics, uses, and benefits of its products and services.

182.    Defendant is aware that the claims that it makes about its products and services are false and misleading.

183.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

184.   Plaintiffs and Class Members were misled into purchasing products and services by Defendant's deceptive conduct as alleged.

185.   Plaintiffs and Class Members were misled and the misrepresentations and omissions were uniform and material.

186.   Pursuant to Business & Professions Code §§ 17203 and 17535, Plaintiffs and Class members seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of advertising the sale and use of VC+. Additionally, Plaintiffs and Class Members request an order awarding restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations.

187.   Plaintiffs and Class Members have suffered injury in fact and have lost money as a result of Defendant's false representations.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of the Class, request that the Court:

A.   That the Court finds that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

B.   That the Court appoint Plaintiffs as representatives of the Class;

C.   That the Court appoint Plaintiffs' counsel as counsel for the Class;

D.   That the Court enter judgment in favor of Plaintiffs and the Class against IDEXX;

E.   That the Court award Plaintiffs and the other Class Members actual damages and all other forms of available relief, as applicable;

F.   That the Court award Plaintiffs and the Class attorney's fees and costs, including interest thereon as allowed or required by law

G.   That the Court enter an injunction requiring Defendant to adopt, implement, and maintain adequate measures to protect the integrity of patient records and its testing process;

H.   That the Court Award Plaintiffs and Class Members pre- and post-judgment interest, to the extent allowable; and

I.   Granting all such further and other relief as the Court deems just and

appropriate.

Respectfully Submitted

By:    _/s Todd M. Friedman_____
Todd M. Friedman, Esq.
Law Offices of Todd M. Friedman, P.C.
*Counsel for Plaintiff and the Putative Class*

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

By:    _/s Todd M. Friedman_____
Todd M. Friedman, Esq.
Law Offices of Todd M. Friedman, P.C.
*Counsel for Plaintiff and Putative Class*

1

2

### CERTIFICATE OF SERVICE

3

Filed electronically on this 22nd day of March, 2024, with:

4

United States District Court CM/ECF system

5

Notification sent electronically via the Court's ECF system to:

6

7

Honorable Fernando L. Aenlle-Rocha
United States District Court
8
Central District of California

9

And All Counsel of Record As Recorded On The Electronic Service List.

10

11

This 22nd day of March, 2024

12

s/Todd M. Friedman, Esq.
13
Todd M. Friedman

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28